1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 FOR THE WESTERN DISTRICT OF WASHINGTON

9 IRON SPRINGS RESORT, LLC, a
Washington limited liability company,

10

11                           Plaintiff,

v.

12 FINITO SERVICES, LLC, a Washington

13 limited liability company, d/b/a
SUNSPOT VACATION RENTALS;

14 and WILLIAM MAY, an individual,
d/b/a OCEAN SHORES SUNSPOTS,

15 LLC, a sole proprietorship,

16                           Defendants.

Case No.

COMPLAINT FOR DAMAGES

JURY DEMAND

17

18        Plaintiff, Iron Springs Resort, LLC, by and through its attorneys of record,

19 AHLERS & CRESSMAN PLLC, for its Complaint against Defendants, Finito Services,

20 LLC, doing business as Sunspot Vacation Rentals, and William May, doing business as

21 Ocean Shores Sunspots, LLC, hereby states and alleges as follows:

22        1.      This is an action for trademark infringement under Section 43(a) of the

23 Lanham Act (15 U.S.C. § 1125(a)), violation of the Anti-Cybersquatting Consumer

24 Protection Act of 1999 (15 U.S.C. § 1125(d)), breach of contract, and conversion.



999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

COMPLAINT FOR DAMAGES – 1

113928.1 (#100875.1)

## PARTIES, JURISDICTION, AND VENUE

2.    Iron Springs Resort, LLC ("Iron Springs") is a Washington limited liability company with its principal place of business in Seattle, King County, Washington.   Iron Springs is the developer and owner of the Iron Springs Resort, located in Grays Harbor County, Washington (the "Resort").

3.    Finito Services, LLC ("Finito Services") is a Washington limited liability company doing business under the registered trade name of Sunspots Vacation Rentals, with its principal place of business in Seattle, King County, Washington.

4.    William May ("May") is an individual who, at all relevant times herein, resided in the State of Washington, and was doing business in the State of Washington as "Ocean Shores Sunspots, LLC," a sole proprietorship.   May is the managing member of Finito Services, and authorized, directed, and/or participated in the unlawful acts alleged herein.

5.    Finito Services, doing business as Sunspots Vacation Rentals, and/or May, doing business as "Ocean Shores Sunspots, LLC," managed the Resort for a period of time as alleged herein.

6.    This Court has jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), and jurisdiction over the State law breach of contract and conversion claims pursuant to 28 U.S.C. § 1367.

7.    Venue is proper under 28 U.S.C. § 1391(b), in that all Defendants reside in this judicial district, and further that a substantial part of the events or omissions giving rise to the asserted claims occurred in this judicial district.

Ahlers & Cressman
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

8.      This Court has personal jurisdiction over Finito Services, inasmuch as Finito Service is a Washington limited liability company with its principal place of business in the State of Washington.  This Court has personal jurisdiction over May, inasmuch as May was domiciled in the State of Washington and doing business in the State of Washington as "Ocean Shores Sunspots, LLC" at all relevant times.

9.      Finito Services, doing business as Sunspots Vacation Rentals, and May, doing business as "Ocean Shores Sunspots, LLC," are collectively referred to hereinafter as "Sunspots."

## GENERAL ALLEGATIONS

10.      On or about November 4, 2010, Iron Springs and Sunspots entered into a Resort Management Agreement (the "Agreement") which, among other things, provided that Sunspots would supply certain management, guest reservations, supervision, and operational services (the "Sunspots Services") to the Resort.  A copy of the Agreement is attached hereto as **Exhibit A**.  Prior to the effective date of the Agreement, Sunspots and May had for several months been providing certain consulting services to the Resort in preparation of the Resort's grand re-opening.

11.      As the manager of the Resort pursuant to the Agreement, Sunspots was entrusted with numerous items of proprietary Resort information, including, without limitation, Resort guest and potential guest registration lists, Resort guest e-mail lists, Resort guest bookings, and control of the web site, <ironspringsresort.com> (the "Resort Information").  The Agreement expressly provided that Iron Springs owned the Resort Information.

COMPLAINT FOR DAMAGES – 3
113928.1 (#100875.1)

AC Ahlers&Cressman
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

12.     Pursuant to the Agreement, Sunspots was required to design and create a primary web site for the Resort.  In the course of performing that obligation, Sunspots registered the additional domain name <ironspringresort.com> (the "Domain Name") in the name of an entity other than Iron Springs.  Sunspots proceeded to design and create a web site for the Resort accessible at the Domain Names (the "Web Site"), and redesigned and created new Web Site content for <ironspringsresort.com>.  Both the Web Site and <ironspringsresort.com> were programmed so as to directly "plug in" to a guest reservation system operated by Sunspots.  Pursuant to the Agreement, Iron Springs owns the Domain Name, the Web Site, and any other marketing materials generated during the term of the Agreement, including guest registrations.

13.     On or about January 26, 2011, Iron Springs terminated the Agreement as permitted by the terms of the Agreement.

14.     Shortly after termination of the Agreement, Sunspots dissociated the Domain Name from the Web Site, such that internet users who entered the Domain Name into a web browser arrived not at the Web Site, but rather at a third-party web site not affiliated or associated with Iron Springs.

15.     Sunspots' hijacking of the Domain Name and displacement of the Web Site caused injury to Iron Springs in several ways, including, without limitation, the following:  (a) potential Resort guests were unable to access the Web Site and obtain information relating to the Resort; and (b) potential Resort guests were mistakenly led to believe that the third-party web sites at which they arrived upon entering the Domain Name into their web browser were associated or affiliated with Iron Springs.

COMPLAINT FOR DAMAGES – 4
113928.1 (#100875.1)

Ahlers&Cressman
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

16.     Iron Springs has demanded on multiple occasions that Sunspots transfer possession and/or control of the Domain Name to Iron Springs.  Sunspots eventually transferred possession and/or control over the <ironspringsresort.com> domain to Iron Springs—after several weeks of using that particular domain name to divert internet traffic away from Iron Springs—but refuses to transfer control over the Domain Name, as well as return all guest e-mail registrations obtained by Sunspots and/or William May to Iron Springs.  The Domain Name continues to be used by Sunspots to direct internet traffic away from Iron Springs and the Resort, and Sunspots continues to hold and exploit the Resort guest e-mail registrations for its own purposes.

17.     Iron Springs has further demanded on multiple occasions that Sunspots return all Resort Information to Iron Springs.  Sunspots has refused to do so.

## FIRST CAUSE OF ACTION – BREACH OF CONTRACT

(Against Sunspots)

18.     Iron Springs re-alleges and incorporates by this reference each and every allegation set forth in paragraphs 1 through 17 as if fully set forth herein.

19.     The Agreement is a valid and enforceable contract.

20.     Sunspots agrees in Section 14 of the Agreement not to use any "Proprietary Information" without the express written consent of Iron Springs.  The term "Proprietary Information" is defined in the Agreement to mean "domain names" and "guest data," among other things.

21.     Sunspots has breached the Agreement in that it has used and/or continues to use "Proprietary Information," namely, the Domain Name and Resort Information, without the express written consent of Iron Springs.

22.     Iron Springs has performed all of its obligations under the Agreement.

COMPLAINT FOR DAMAGES – 5
113928.1 (#100875.1)

23.     As a direct and proximate result of the actions of Sunspots as alleged herein, Iron Springs has been damaged, the full amount of which damages cannot yet be ascertained, but will be proven at trial.

24.     Iron Springs has suffered irreparable harm as a result of the above-described breach of contract, and will continue to suffer irreparable harm absent injunctive relief.

25.     Iron Springs is entitled to a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction as requested below.

**SECOND CAUSE OF ACTION – CONVERSION**

(Against Sunspots)

26.     Iron Springs re-alleges and incorporates by this reference each and every allegation set forth in paragraphs 1 through 25 as if fully set forth herein.

27.     At all relevant times herein, Iron Springs has owned the Domain Name, <ironspringsresort.com>, and Resort Information and had the right to possession thereof.

28.     During its term as manager of the Resort pursuant to the Agreement, Sunspots was entrusted by Iron Springs with possession and/or control of the Domain Name, <ironspringsresort.com>, and Resort Information.

29.     Upon termination of the Agreement, Sunspots lost any right it may have had to possession and/or control of the Domain Name, <ironspringsresort.com>, and Resort Information, and became immediately obligated to transfer possession and/or control of the Domain Name and Resort Information to the rightful owner, Iron Springs.

COMPLAINT FOR DAMAGES – 6

113928.1 (#100875.1)

**4C** Ahlers & Cressman
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

30.     Sunspots has nevertheless maintained possession and/or control of the Domain Name and Resort Information, and has used and continues to use the Domain Name and Resort Information for its own purposes, notwithstanding Iron Springs' demands that it take the necessary actions to place the Domain Name and Resort Information back in Iron Springs' possession and/or control.

31.     As a direct and proximate result of the actions of Sunspots as alleged herein, Iron Springs has been damaged, the full amount of which damages cannot yet be ascertained, but will be proven at trial.

32.     Iron Springs has suffered irreparable harm as a result of the above-described actions, and will continue to suffer irreparable harm absent injunctive relief.

33.     Iron Springs is entitled to a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction as requested below.

**THIRD CAUSE OF ACTION – VIOLATION OF LANHAM ACT § 43(a)**

(Against Sunspots and May)

34.     Iron Springs re-alleges and incorporates by this reference each and every allegation set forth in Paragraphs 1 through 33 as if fully set forth herein.

35.     Since acquiring the Resort in 2010, Iron Springs has continuously sold and/or offered for sale in interstate commerce vacation resort services under the service mark IRON SPRINGS RESORT (the "Mark").  Prior to Iron Springs' acquisition of the Resort, the Estate of Olive Little has continuously sold and/or offered for sale in interstate commerce vacation resort services under the Mark since approximately 1947. Iron Springs acquired the Mark in addition to the Resort from the Estate of Olive Little in 2010.

COMPLAINT FOR DAMAGES – 7
113928.1 (#100875.1)

AC Ahlers&Cressman
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

36.     As a result of substantial sales and extensive advertising and promotion, the Mark has become widely and favorably known as identifying vacation resort services originating from, sponsored by, or affiliated with Iron Springs.  The public has come to associate the Mark with Iron Springs as a source of high-quality vacation resort services.

37.     Sunspots has infringed and continues to infringe on Iron Springs' rights in the Mark by its use of the Domain Name, which incorporates the Mark, in whole or in part, in interstate commerce in connection with vacation resort services in a manner that is likely to cause confusion, mistake, or deception among consumers as to the origin, sponsorship, or approval of Sunspots' services.  Specifically, consumers are likely to mistakenly conclude that the third-party goods and services to which they are being re-directed after entering the Domain Name in their web browser are somehow sponsored by or affiliated with Iron Springs.

38.     May authorized, directed, and/or participated in the unlawful acts alleged herein, and is accordingly personally liable for the resulting damages.

39.     As a direct and proximate result of the actions of Sunspots as alleged herein, Iron Springs has been damaged, the full amount of which damages cannot yet be ascertained, but will be proven at trial.

40.     Iron Springs has suffered irreparable harm as a result of the above-described actions, and will continue to suffer irreparable harm absent injunctive relief.

41.     Iron Springs is entitled to a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction as requested below.

COMPLAINT FOR DAMAGES – 8
113928.1 (#100875.1)

AC Ahlers&Cressman
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

**FOURTH CAUSE OF ACTION – VIOLATION OF LANHAM ACT § 43(d)**

(Against Sunspots and May)

42.     Iron Springs re-alleges and incorporates by this reference each and every allegation set forth in Paragraphs 1 through 41 as if fully set forth herein.

43.     Sunspots has violated The Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d), in that it has used and/or trafficked in the Domain Name, which is identical or confusingly similar to the Mark, as alleged above.

44.     The Mark was distinctive or had acquired distinctiveness at all relevant times herein.

45.     Sunspots used or trafficked in the Domain Name with a bad faith intent to profit from the Mark.

46.     May authorized, directed, and/or participated in the unlawful acts alleged herein, and is accordingly personally liable for the resulting damages.

47.     As a direct and proximate result of the actions of Sunspots as alleged herein, Iron Springs has been damaged, the full amount of which damages cannot yet be ascertained, but will be proven at trial.

48.     Iron Springs has suffered irreparable harm as a result of the above-described actions, and will continue to suffer irreparable harm absent injunctive relief.

49.     Iron Springs is entitled to a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction as requested below.

COMPLAINT FOR DAMAGES – 9
113928.1 (#100875.1)

Ahlers&Cressman·
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

## PRAYER FOR RELIEF

WHEREFORE, Iron Springs prays for relief as follows:

1.      That a Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction be entered prohibiting Sunspots, May, and all persons acting in concert or participation with them, from using or trafficking in any Domain Names containing the Mark or any confusingly-similar variation thereof;

2.      That Sunspots and May be ordered to transfer, and otherwise surrender control and/or possession of, the Domain Names to Iron Springs;

3.      That Iron Springs be awarded compensatory damages and/or any profits made by Sunspots and May as a result of their unlawful actions, and/or statutory damages, in an amount to be determined at trial;

4.      That Iron Springs be awarded treble damages as permitted by 15 U.S.C. § 1117;

5.      That Iron Springs be awarded its reasonable attorneys' fees and costs of suit as permitted by 15 U.S.C. § 1117;

6.      For prejudgment interest at the legal rate; and

7.      For such other and further relief as the Court deems proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Iron Springs demands a jury on all claims so triable.

DATED:  This 2nd day of May, 2011.

AHLERS & CRESSMAN PLLC

By: _____

David F. Betz, WSBA # 28518
Attorneys for Plaintiff

**AC** Ahlers&Cressman
999 THIRD AVENUE, SUITE 3800
SEATTLE, WASHINGTON 98104-4088
(206) 287-9900  Fax: (206) 287-9902

COMPLAINT FOR DAMAGES – 10
113928.1 (#100875.1)

# EXHIBIT A

## RESORT MANAGEMENT AGREEMENT

This Resort Management Agreement (this "Agreement") is made and entered into as of the _____ day of _____, 2010 (the "Effective Date"), by and between Iron Springs Resort, LLC, a Washington limited liability company (the "Owner"), and Ocean Shores Sunspots LLC, a Washington State limited liability company (the "Manager"), collectively referred to herein as a "Party", or, individually, the "Parties".

## R E C I T A L S

WHEREAS, Owner is the developer and owner of that certain resort located at approximately 3707 State Highway 109, Copalis Beach, Washington, commonly known as the Iron Springs Resort, which resort is comprised of, among other things, twenty six (26) rental cabins, all as more specifically described on Exhibit A attached hereto and by this reference incorporated herein (the "Resort");

WHEREAS, Owner desires to retain the Manager to manage, supervise, and operate the Resort pursuant to the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

1.      Designation of Manager. Owner hereby appoints and designates Manager as the Owner's sole and exclusive agent to manage, supervise, and operate the Resort pursuant to the terms and conditions of this Agreement.

2.      Manager's Authority and Duties. In addition to incidental powers and duties implicit in connection with Manager's agency, Manager shall, on behalf of and at the expense of Owner:

A.      Operate the Resort in a professional manner and provide or arrange for such services to be provided within the Resort as are customarily provided by operators of resorts of comparable class and standing, including but not limited to: front desk operation during the times approved by Owner, maid service, in-room telephones, television in every guest room, and reservation and booking services. Subject to the terms and conditions of this Agreement, the Budget (as defined below), and the approval of Owner, Manager shall have all reasonable discretion in the management, supervision, and operation of the Resort, including, without limitation, establishing labor policies, credit policies, terms of Resort guest admittance, charges for rentals, prices for service facilities, offering of food and beverages, purchasing of equipment and supplies as required for the daily operation of the Resort, repairing and replacing Resort furnishings, fixtures and equipment, and all phases of advertising, marketing, promotion, and publicity relating to the Resort.

B.      To hire, promote, discharge and supervise the work of Resort staff and to supervise through said staff the hiring, promotion, discharge and work of all other operating and service employees performing services in or about the Resort. All such employees shall be employees of Manager but the wages or other compensation (including fringe benefits) of such employees shall constitute Resort Operating Expenses (as defined below).

C.      To negotiate for the benefit of the Owner arrangements with concessionaires, licensees, or other intended users of the facilities of the Resort.

D.      To negotiate and enter into contracts on behalf of Owner for gas, electricity, water, telephone, internet, trash collection, sewer, landscaping, janitorial service, security service and any

other utilities, services and concessions which are convenient or necessary for the maintenance and operation of the Resort which are, or will be, furnished to the Resort for terms of not greater than one (1) year, unless otherwise approved by Owner. All such service contracts shall be entered into by Manager for the account of and in the name of Owner and shall be terminable on thirty (30) days notice or less, unless otherwise approved by Owner. The funds necessary to pay for such services shall be paid from the Bank Account pursuant to the Budget.

     E.     To purchase materials and supplies necessary for the operation of the Resort pursuant to the Budget.

     F.     To make or install, or cause to be made or installed in accordance with the terms and conditions of this Agreement and the Budget all necessary or desirable repairs, decorations, renewals, revisions, alterations, rebuildings, replacements, additions and improvements in and to the Resort.

     G.     To apply for and obtain and maintain all licenses and permits required or desirable in connection with the management and operation of the Resort.

     H.     To handle booking, reservations, sales, and group sales services for the Resort on behalf of Owner pursuant to the fees and schedule outlined on Exhibit B.

     I.     To cause all such acts and things to be done in and about the Resort as necessary to comply with all statutes, ordinances, laws, rules, regulations, orders and requirements of any federal, state or municipal government and appropriate departments, commissions, boards and officers having jurisdiction regarding the operation and, maintenance thereof.

     J.     To deposit in a banking institution or institutions acceptable to Owner in Owner's name all monies generated by the Resort and to pay the operational and maintenance costs and expenses of the Resort on behalf of and in the name of the Owner at such times as the same are required in connection with the operation of the Resort pursuant to the Budget.

     K.     To institute, in its own name or in the name of the Owner any and all legal actions or proceedings to collect charges or other income from the Resort or to oust or dispossess guests or other persons in possession thereof, or to cancel or terminate any lease, license or concession agreement for the breach thereof or default thereunder.

     L.     To enter into equipment or other leases or purchases upon such terms, provisions and conditions as may be outlined in the Budget, including television sets, telephone and other equipment, furniture, furnishings and fixtures.

     M.     To perform and do any and all acts which are reasonably necessary to operate the Resort efficiently, economically and to maximize the financial operations of the Resort.

     N.     To prepare and present to Owner financial reports relating to the management, supervision, and operation of the Resort as outlined in this Agreement.

3.     <u>Operation of Resort.</u>

     A.     <u>Control of Revenues</u>. Manager shall open one or more accounts in the financial institution(s) designated by Owner for the operation of the Resort (collectively, the "Bank Account"), into which all revenues generated from the Resort shall be deposited and from which Manager is authorized as "Agent for Owner" to draw funds to pay all approved and authorized expenses for the

Resort, as more fully set forth herein. As such, Owner shall execute form "W-9" request for taxpayer identification number and certification, and a designation of agent form or other form required by the Bank, authorizing Manager to perform banking services on behalf of Owner. The funds in the Bank Account shall at all times be the separate property of the Owner, maintained separate and apart from any funds of Manager or others. The Bank Account shall consist of one or more non-interest bearing transactional accounts unless the amounts to be deposited consist of security deposits required by state law to be maintained in separate accounts, in which case Manager shall establish such additional account or accounts and maintain such account or accounts in accordance with applicable law. If such additional accounts are established, they shall be deemed collectively to constitute the "Bank Account" for purposes of this Agreement. The foregoing arrangement shall not be deemed to be a trust, and Manager's responsibilities with respect to the Bank Account shall be only as specifically set forth herein. Owner acknowledges that the principal purpose of the Bank Account is to facilitate the management of the Resort hereunder and not as an investment opportunity for the Owner. Manager shall have no duty to provide or arrange for any particular rate of return for the Bank Account, nor any obligation to seek alternate investment opportunities for the Bank Account.  No capital expenditures shall be paid by Manager from the Bank Account.

B.     Budget.  Within 30 days after the Effective Date, Manager shall prepare and submit to Owner a proposed operating and capital budget for the management, supervision, and operation of the Resort for the remainder of the calendar year in which the Effective Date occurs. The parties acknowledge and agree that this initial budget may require adjustment subject to the restoration/remodel schedule and the dates on which the cabins and other facilities become operational and such changes will be submitted to Owner for approval. Thereafter, not less than 60 days prior to the first day of each subsequent calendar year, Manager shall prepare and submit to Owner an updated operating and capital budget for the upcoming year. Such operating and capital budgets shall: (i) be prepared on an accrual basis, as directed by Owner, and (ii) show a month by month projection of income, expenses, capital expenditures, reserves, and other non-recurring items. If Owner fails to notify Manager within fifteen (15) days after Owner's receipt of the proposed operating and capital budget as to whether Owner approves or disapproves the proposed operating and capital budget, then the operating and capital budget proposed by Manager shall be deemed to be rejected by Owner and the most recent operating and capital budget expressly approved by Owner shall remain in full force and effect (the most recent operating and capital budget expressly approved by Owner, the "Budget"). Manager shall implement the Budget and use its best efforts to ensure that the actual cost of operating the Resort shall not exceed the Budget. The Budget shall constitute an authorization for Manager to expend necessary monies to manage and operate the Resort in accordance with the Budget and subject to the provisions of this Agreement until a subsequent Budget is approved. Any unexpected or non-recurring costs over $2,000 not specifically addressed in the Budget shall require the prior written approval of the Owner in each instance. Manager is further authorized to incur charges in the event of an emergency and Manager believes they are necessary to protect the Property from damage,  return the Property to rentable condition or maintain services for Guests.  Capital improvements shall be proposed by the Manager but the implementation and costs of such improvements shall be under the express control of the Owner in each instance unless otherwise included in the Budget.

C.     Purchase of Supplies and Materials.  Manager shall, on behalf of Owner, purchase all equipment, tools, appliances, materials and supplies reasonably necessary or desirable for the

3

maintenance and operation of the Resort. All such purchases shall be made pursuant to the Budget. Manager shall use its best efforts to qualify for any cash and trade discounts, refunds, or credits and which, if they are in the form of cash, shall be deposited by Manager into the Bank Account. If Owner is entitled to discounts from contractors and suppliers under any national or regional agreements, Manager shall avail itself of such national or regional agreements whenever possible.

   D. <u>Performance Criteria</u>. Manager shall make all reasonable efforts to operate the resort in a professional manner and to maximize the economic return to the Owner. Owner and Manager agree that the "3 diamond" rating from AAA Diamond Ratings System shall be the goal for which the Resort will be operated.  Manager shall be responsible for setting a range of room rates subject to Owners express approval.  Owner acknowledges that Manger may adjust rates periodically depending on market conditions.

   E. <u>Resort Advertising and Marketing</u>. Within 45 days after the Effective Date, Manager will produce a written Marketing Plan with Marketing, Advertising and Public Relations initiatives to be employed in the Marketing of the Resort including preliminary materials depicting the general creative concept all subject to Owner's approval.  Manager shall complete, and conduct the initiatives, and create the creative materials in keeping with the Plan and will submit any materials which deviate from that plan to Owner for approval prior to release to the general public.  Thereafter, not less than 60 days prior to the first day of each fiscal year Manager shall submit to Owner for its approval a revised or new Marketing Plan for the Resort. The Marketing Plan may include conventional media advertising, outdoor displays, internet, website, online travel agencies, social media, and other new technology marketing and/or advertising. Subject to Owner's express approval in each instance, Manager shall also design and create a primary website for the Resort, which such website shall include photos, slide shows, floor plans, videos, as well as Resort background, information, and online booking. Manager shall be allowed to offer up to seven (7) total days of no-charge Resort accommodations per unit per calendar year as "promotional stays" to members of the press, travel agents, referrers, and governmental officials.  It is the intent of the parties that the Sunspots Resorts brand name shall not be included on websites that are dedicated to the Resort or on written or printed materials.  The Sunspots Resorts brand name and logo may appear in third party advertising for the Resort.  Further, it is acknowledged that certain media will prohibit the use of resort name. In those circumstances, the name of the individual cabins may be used without reference to the Resort.  The costs for Resort marketing and advertising shall be considered Resort Operating Expenses. In connection with the provisions of this Section 3(E), Owner hereby grants to Manager a temporary license to utilize for marketing, advertising, and promotion purposes only those images, names, graphics, or other materials of the Resort which Owner may specifically approve in advance and in writing. All such images and other marketing materials are the sole property of Owner and shall be considered Proprietary Information (as defined below).

   F. <u>Resort Booking and Sales</u>. Manager shall be responsible to administer all Resort booking and sales efforts. Telephone calls, emails, and all other inquiries shall be primarily handled in Manager's central office, but Manager shall establish and supervise booking and sales systems at the Resort. Manager will record and track sales and reservations information and will report such data to Owner as provided in Section 4(B) below. Any and all data collected by Manager pursuant to this Section 3(F) shall be the sole property of Owner and shall constitute Proprietary Information.

   G. <u>Technical Services</u>.  Manager shall be responsible to devise, design, and operate software for the account of Resort bookings and reservations, occupancy, housekeeping, maintenance, and accounting. Manager will also administer internet connectivity at the Resort. The costs for such technical services provided by Manager shall be considered Resort Operating Expenses.

4.      Resort Income and Expenses.

A.      Deposit of Revenues and Payment of Expenses. Manager shall immediately deposit into the Bank Account all gross revenues generated from the Resort. For purposes of this Agreement, gross revenues shall mean the total revenue for cash or credit (without reduction by reason of any cost or expense) derived from operating the Resort, including, without limitation, rentals of cabins, sleeping, meeting, banquet, and all other rooms or facilities and all other ancillary operations within the Resort, including, without limitation, restaurants, lounges, kitchens, meeting rooms, storage areas, other support areas associated with such facilities, any coin operated equipment and games (including washers, dryers, arcade machines and video rentals), any facilities associated with room service or catering fees and any and all other revenue generating endeavors managed, supervised, or operated by Manager.

Thereafter, Manager shall pay on behalf of Owner from the Bank Account all approved costs and expenses outlined in the Budget (the "Resort Operating Expenses"). As outlined in the Budget, these Resort Operating Expenses shall include, without limitation, the resort management fee described in Section 4(D), reimbursement to Manager for compensation of resort personnel, including the salaries, wages, payroll taxes and employee benefits of the resort staff, leasing costs, costs of laundry, cleaning supplies, uniforms, front desk materials, reservation service fees, guest room supplies, food and beverage costs, advertising and marketing costs, travel agent's commissions, costs of food and beverage, paper products, glassware, chinaware, silverware, and legal and accounting fees. Manager shall accrue for charges, fees, bills, invoices, etc. for that month which cannot be paid by the month end.

Manager shall disburse or transfer to Owner the balance remaining in the Bank Account (less any amount retained for reserves, as outlined in the Budget) after payment of all approved expenditures at the time the monthly reports are issued to Owner pursuant to Section 4(C). Notwithstanding the foregoing, Owner shall have the right to request a transfer of funds at any time in excess of the amount reasonably required by Manager for those disbursement and compensation purposes in connection with management, supervision, and operation of the Resort outlined in the Budget.

If Manager fails to make any payment when required or fails to perform any act required under this Agreement, then Owner, after ten (10) business days written notice to Manager (or, in the case of any emergency, without notice) and without waiving or releasing Manager from any of its obligations hereunder, may (but shall not be required to) make such payment or perform such act. Owner shall thereafter have (in addition to any other right or remedy) the right to offset all costs and expenses incurred in exercising its rights under this Section 4(A)  against any sums due or to become due to Manager, including, without limitation, the resort management fee and any costs and expenses reimbursable by Owner under this Agreement. Manager shall maintain a minimum balance in the Bank Account as directed by Owner.

B.      Costs and Expenses of Manager. Except as otherwise expressly provided herein, and unless approved in writing by Owner, all costs and expenses incurred by or on behalf of Manager in performing its obligations hereunder not specifically included in the Budget shall be borne solely by Manager.

C.      Reports. Manager shall furnish Owner with monthly reports relating to the management, supervision, and operation of the Resort for the preceding calendar month, not later than fifteen (15) days after the end of the preceding month. Such reports shall be on an accrual basis and in a form compatible with Generally Accepted Accounting Principals (GAAP) for the Lodging Industry,

reasonably acceptable to Owner, and shall include, at a minimum, an income statement, balance sheet and sales reports detailing sales by cabin, daily, weekly, monthly and year to date and average daily rate (ADR). In addition, Manager shall meet with Owner on at least a monthly basis to present such monthly reports.

D.     Resort Management Fee. As compensation for its services to and on behalf of the Owner under this Agreement, Manager shall be entitled to those total fees as described and set forth on Exhibit B which is attached hereto and by this reference incorporated herein. Unless approved by Owner in advance and in writing, or unless specifically included in the Budget, Manager shall receive no other forms of compensation for performing under this Agreement.

E.     Deficits. If the amount of revenues deposited into the Bank Account for any month shall be less than the Resort Operating Expenses for such month, Manager shall promptly notify Owner and the Owner thereafter shall deposit into the Bank Account, the amount of such deficiency.

F.     Duty of Care.  Manager shall exercise such control over accounting and financial transactions as is reasonably required to protect Owner's assets from loss or diminution due to error, negligence, recklessness, willful misconduct, fraud or criminal acts on the part of Manager or its agents, contractors, subcontractors, associates or employees.

5.     Upkeep of the Common Areas. In addition to Manager's obligations as outlined in Section 2(A), Manager shall be responsible for the repair, maintenance, security and administration of the common areas of the Resort. The costs and expenses of such shall be considered a Resort Operating Expense. Manager shall cause the common areas of the Resort including the buildings, other improvements, and equipment to be maintained as outlined in the Budget, supervise, and order to be done all reasonable things which are necessary to the proper maintenance of the common areas of the Resort in accordance with the Budget. Manager shall be responsible for the maintenance and repair of the exterior of the buildings, other improvements and grounds, including without limitation, painting thereof, repair and replacement of the exterior trim, roofs, fences and maintenance of landscaping, walkways, and driveways. Manager shall also be responsible for maintenance, repair and replacement of common areas within the buildings, including, without limitation, landings, stairways, utility lines, and all improvements and other items located within or used in connection with the common areas of the Resort, which shall be considered a Resort Operating Expense.

6.     Books of Account. Manager agrees to keep separate records, either paper or electronic, with respect to the management and operation of the Resort, and to retain those records for no less than seven (7) years. Such books, records and accounts shall include, without limitation, vouchers, statements, receipted bills and invoices, employment records, documents, notices, agreements, contracts, correspondence, leases, permits, licenses, authorizations, all collections and disbursements related to the Resort, the deposits to the Bank Account and other business and affairs of the Resort within the responsibility of Manager pursuant to this Agreement. Owner shall have the right, during the term of this Agreement, to inspect such records and audit the reports during normal business hours upon at least three (3) days notice. All such records, data, information and documents shall at all times be the property of Owner. Upon termination of this agreement, Owner may request an electronic copy of these records which shall be delivered within thirty (30) days after of such request. Owner may also request a physical copy of all files which shall be copied and delivered by Manager to Owner within thirty (30) days after such request.  Owner shall reimburse Manager for the actual costs for such copies.

7.     Taxes. Manager shall not be liable to the Owner (a) for either federal or state income or corporate excise taxes attributable to income earned by, or paid to, the Owner under this Agreement; and (b) for the Owner's ad valorem personal and real property taxes.

8.    Insurance.

        A.    Owner shall, as a Resort Operating Expense, maintain in full force and effect during the term of this Agreement: (i) "all risk" direct damage property insurance on replacement cost terms for the value of the structures and improvements within the Resort, including builder's risk insurance and demolition, debris removal and increased cost coverage where applicable, to cover physical loss or damage to the Resort from fire and extended coverage perils, including but not limited to vandalism and malicious mischief; and (ii) comprehensive or commercial general liability insurance, on an occurrence form, in an amount not less than $1,000,000 each occurrence with respect to the Resort and covering third-party personal injury, property damage, and bodily injury (including death). Owner shall include Manager as an additional insured. Manager shall notify Owner within twenty four (24) hours after the Manager receives notice of any loss, damage, or injury, which may result in a claim under such insurance and shall not take any action which might prejudice Owner in its defense to any claim based on such loss, damage, or injury.

        B.    Manager shall at all times during the term of this Agreement maintain the appropriate insurance coverage for its business operations at the Resort, which such coverages shall include at least the following:

| INSURANCE | LIMITS |
|---|---|
| Workers' Compensation And Employers' Liability | Coverage: Limits required by the internal laws of the State of Washington and any other location where any operations relating to this agreement are performed. |
| Commercial General Liability Insurance | $1,000,000 per occurrence/ $2,000,000 aggregate |
| Professional Liability Insurance | $1,000,000 each loss and annually in the aggregate (claims made form) |
| Comprehensive Auto Liability | $1,000,000 (any auto/owned/non-owned/hired) |

        Upon written request, Manager shall furnish Owner, at the time of execution of this Agreement, certificates of insurance evidencing the insurance coverage required under this Section 8(B). Such certificates shall be issued by the insurer(s) or its authorized agent(s) and shall provide that Owner will be given thirty (30) days prior written notice of cancellation in Manager's coverage by underwriters or ten (10) days notice if cancelled for non-payment of premium. All such policies of Manager, except for workers' compensation for Manager's employees directly involved with the operation of the Resort (which shall be considered a Resort Operating Expense) shall be at Manager's sole cost and expense. Manager may maintain such coverage through the use of "blanket coverage." All such policies shall be issued by insurers authorized to do business within the State of Washington, and with a Best's rating of A-VIII or higher as reported in the most recent Property & Casualty Reports Key Rating Guide edition.

        C.    Manager shall require that each contractor and subcontractor hired to perform work at the Resort maintain liability insurance against risk of bodily injury, personal injury, and damage to property of others, and direct damage insurance covering physical damage to personal property belonging or leased or rented to it with terms and in amounts sufficient to pay all incurred liabilities and claim expenses and to replace such personal property in the event of loss, at such contractor's and subcontractor's sole cost and expense. Manager shall require from vendors and contractors the following insurance:

7

| INSURANCE | MINIMUM LIMITS |
|-----------|----------------|
| Workers' Compensation | As required by the internal laws of the State of Washington and any other location where any operations relating to the Resort are performed, with waiver of subrogation against Owner and Manager. |
| Employer's Liability | $1,000,000 each accident and as to aggregate limits. |
| Commercial General Liability* | $1,000,000 per occurrence/$2,000,000 aggregate |
| Comprehensive Auto Liability* | $1,000,000 (any auto/owned/non-owned/hired) |

*These coverages shall be primary as to Owner and Manager and will cover Owner and Manager as insureds for any allegation, claim, loss, damage, demand, or judgment, or other causes of action arising out of their presence or out of the contractors' or subcontractor's presence upon or out of operations or operations or work done at the Property by the contractor or subcontractor for or on behalf of Owner and Manager. Owner and Manager shall be named as additional insureds on such all general liability policies both for operations and for completed operations of the named insured for as long as Owner or Manager may be exposed to loss arising out of such operations. The policies shall be written on an "occurrence" and not "claims-made" form basis. If contractor's work involves hazardous materials or environmental abatement work, contractor will be required to provide evidence of Contractor's Pollution Liability, with Owner and Manager as additional insureds. If the contractor's work involves professional design or engineering, special evidence of design professional liability (also known as E&O) coverage will also be required.

Owner may require additional coverage if the work to be performed is, in its judgment, sufficiently large or hazardous and may waive certain limits or requirements on a case-by-case basis for incidental or personal service contracts or jobs. Before any work can begin, each contractor or subcontractor will submit Certificates of Insurance and endorsements in form and substance satisfactory to Owner as evidence of the coverages required. Each liability policy certificate will provide for (i) cross-liability or severability of interests, covering the named insured for any claim brought against it by any of the additional insureds; (ii) waiver of subrogation as against Owner and Manager and waiver of any right of contribution from their respective insurers; and (iii) if contractor's or subcontractor's insurance is provided by means of a so-called "blanket policy," the aggregate must apply per project, or per location. Each certificate will bear an endorsement requiring thirty (30) days' prior written notice of cancellation, material alteration, or non-renewal. All such policies shall be issued by insurers authorized to do business within the State of Washington and with a Best's rating of A-VIII or higher as reported in the most recent Property & Casualty Reports Key Rating Guide edition.

9.      Indemnity. Manager agrees to indemnify and hold the Owner and its affiliates and each of their respective employees, officers, directors, and agents harmless from and against any and all liabilities, obligations, claims, losses, causes of action, suits, proceedings, awards, judgments, settlements, demands, damages, costs, expenses, fines, penalties, deficiencies, taxes and fees, (including without limitation the fees, expenses, disbursements and investigation costs of attorneys and consultants) arising directly or indirectly out of or resulting in any way from or in connection with: (i) any acts or omissions of Manager, its agents or employees arising under this Agreement; (ii) any failure of Manager to perform in any respect any of its obligations under this Agreement, provided such failure was not directly caused by the intentional or grossly negligent acts of Owner and Owner has furnished to Manager funds to perform such obligations as outlined in

the Budget; and/or (iii) any acts of Manager beyond the scope of Manager's authority hereunder. However, it is agreed that, under no circumstances shall Manager be held liable to the Owner or to any other party for loss or damage arising out of alleged or actual terrorists' acts. The indemnities in this Section 9 shall survive expiration or termination of this Agreement.

10.     Furniture, Furnishings, Fixtures and Equipment.

A.      Acquisition. In order to operate the Resort effectively as lodging accommodations with related service facilities, Manager, under the express approval of the Owner in each instance or as outlined in the Budget, shall purchase or lease, and at all times maintain or cause to be maintained within the Resort furniture, furnishings, fixtures, supplies, and equipment sufficient in number, design and quality to furnish and supply the Resort with the minimum standards established by Owner. All such items purchased or leased shall remain the separate property of the Owner and Manager shall not be liable for the loss, theft, damage or destruction thereof in the normal course of operations; provided, however, that such items as linens, bedspreads, glassware, chinaware, kitchen utensils, eating utensils, television sets and small appliances shall be of a standard design approved by Owner and Manager shall provide each room with the requisite number thereof.

B.      Replacements and Additions. As a Resort Operating Expense, Manager shall replace, or add to, the linens, bedspreads, television sets and small appliances at such time and in such amount as provided in the Budget.

11.     Management Term.

A.      The term of this Agreement and the agency created thereby shall commence upon the Effective Date and shall continue for two (2) calendar years; provided, however, that Owner may terminate this Agreement at any time, for fraud, gross negligence, willful misconduct, material breach of Manager in complying with the terms of this Agreement, failure to satisfactorily perform hereunder (which such failure shall be determined by Owner, in Owner's sole discretion), and/or bankruptcy, insolvency, or dissolution of Manager. Prior to a termination in the event of fraud, gross negligence, willful misconduct, material breach or failure to perform, Owner will provide written notice to Manager and Manager shall have 10 days to remedy such breach or this agreement shall terminate. If such breach cannot be remedied within the 10 day period, Manager shall have up to 60 days to complete a remedy subject to Manager pursuing such remedy with commercially reasonable diligence.

B.      Upon the termination of this Agreement or on the cessation of the operation of the Resort, Manager shall yield up the Resort to Owner in good order, repair and condition, excepting reasonable wear and tear and damage by fire or other casualty.

C.      In the event the Resort is destroyed or substantially damaged by fire or other casualty, this Agreement shall remain in force and effect unless the Owner elects not to repair or rebuild the Resort in which event this Agreement shall terminate. Otherwise, during any period of repair and restoration, the responsibilities of Manager shall abate and recommence upon completion of restoration and repair.

9

12.    <u>Assignment</u>. Manager shall not assign this Agreement without the written consent of Owner, which such consent Owner may withhold in its sole and absolute discretion.

13.    <u>Construction and the Owner Acknowledgements</u>. By the execution hereof, the Owner and Manager agree that:

(i)    the agency relationship hereby created does not create a de jure or de facto corporation;

(ii)    Manager is not a partner or joint venturer with the Owner but is the agent and independent contractor of the Owner;

(iii)    The only compensation Manager is entitled to under this Agreement are those sums properly payable as outlined on Exhibit B;

(iv)    Manager has no interest in the goodwill, if any, associated with the operation of the Resort;

(v)    Any goodwill associated with the operation of the Resort, whether by efforts of Manager or otherwise, shall inure solely to the Owner; and

(vi)    Manager has no interest, legal or beneficial, in neither the Resort, nor any room or commercial area therein and shall not be entitled to receive any portion of the proceeds resulting from any disposition of all or any part thereof.

The Owner expressly retains both legal title and beneficial ownership of the Resort and its all contents, which such contents shall expressly include, without limitation, any images or marketing materials generated during the term of this Agreement and any Proprietary Information and the Owner is not contributing the Resort or its contents, or the use thereof, to any imagined or assumed entity.

14.    <u>Proprietary Information</u>. Manager shall at all times hold in strict confidence and not use or disclose any other party any Proprietary Information or anything relating to such Proprietary Information in whole or in part, nor permit others to use or disclose it in any way, without the prior express written consent of Owner in each instance; except as Owner may approve in according with the Marketing Plan. As used in this Agreement, the term "Proprietary Information" shall mean and refer to any information of Owner, the Resort, or the True Family, including, without limitation, guest data, information, plans, programs, processes, trade secrets, know-how, prices, guest and supplier lists and data, guest information, guest databases, guest or other guest sales/booking lead sources (including affiliates), guest or other guest sales/booking lead providers, guest or other guest sales/booking lead generation methods, pricing and marketing plans, policies and strategies, details of guest and supplier relationships, operations methods, sales techniques, revenue forecasts, employees and independent contractors, new recruitment and personnel acquisition plans, web sites, internet addresses, phone numbers, mailing or billing addresses, email addresses and domain names, including all software of Owner, information and processes necessary to operate the Resort and/or the Resort web sites, and any confidential and/or personal information related to Resort guests; provided, however, that Manager's obligations hereunder shall not apply if such information: (a) is available to the general public at large and generally known within the Resort industry where the Resort is located, or (b) is required to be disclosed pursuant to law, court order or subpoena.

Likewise, Owner agrees to hold in confidence and not use or disclose to any third party Proprietary Information of the Manager, its business, methods or operations. Both parties agree that the

10

existence of a contract between the parties is not Proprietary Information but that the terms of the Agreement will be held in confidence.

15.     Notices. Notices hereunder to the Owner or Manager shall be delivered personally, or deposited in the United States mail, certified mail, return receipt requested, postage fully paid, addressed to the Owner or Manager, as the case may be, at the address set forth below or shall be deemed to be given when delivered personally:

| | |
|---|---|
| If to Owner: | Iron Springs Resort, LLC<br>PO Box 24687<br>Seattle, WA  98124 |
| cc: | Jones Waldo Holbrook & McDonough<br>Attention: Travis M. Wilson, Esq.<br>170 South Main Street, Suite 1500<br>Salt Lake City, UT  84101 |
| If to Manager: | Ocean Shores Sunspots LLC<br>749 Pt. Brown Ave. NW #3<br>Ocean Shores, WA 98569 |
| | Finito Services LLC<br>PO Box 21305<br>Seattle, WA 98111 |

16.     Attorneys' Fees. If Owner or Manager shall institute any action or proceeding against the other relating to this Agreement, the prevailing party shall have the right to collect from the non prevailing party all reasonably attorney's fees and costs (including fees and costs on appeal), as fixed by the court in the same action.

17.     Governing Law.  This Agreement and the obligations of Owner and Manager shall be governed by, and construed and enforced in accordance with the internal laws of the State of Washington. Venue and jurisdiction for all disputes or actions under this Agreement shall lie in the state and federal courts located within King County, Washington.

18.     Entire Agreement. This Agreement, together with any other writings signed by the parties expressly stated to be supplemental hereto and together with any instruments to be executed and delivered under this Agreement, constitutes the entire Agreement between the parties with respect to the agency created hereunder and supersedes all prior understandings and writings, and may be changed only by a writing signed by the parties hereto.

19.     Severability. The invalidity in whole or in part of any term, covenant or provision hereof shall not affect the validity of the remainder hereof.

20.     Waiver.  No consent or waiver, express or implied, by either party to or of any breach or default by the other party in the performance of its obligations hereunder, shall be valid unless in writing. No such consent or waiver shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of any other obligations of such party hereunder. The failure of any party to declare the other party in default shall not constitute a waiver by such party of its rights hereunder, irrespective of how long such failure continues. The granting of any consent or approval in any one instance by

or on behalf of Owner shall not be construed to waive or limit the need for such consent in any other or subsequent instance

     21.    <u>Amendment</u>.  This Agreement may not be amended or modified except by an agreement in writing signed by the party against whom enforcement of such change or modification is sought.

     22.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, and all of which together, shall constitute one document hereunder.

     23.    <u>Miscellaneous</u>. The terms "the Owner" or "Manager" wherever herein used shall include the person, or persons, named and his, her, its, or their successors, heirs, executors, administrators and permitted person, or persons, named and his, her, its, or their successors, heirs, administrators and permitted assignees. Where the context so admits or requires, use of the singular includes the plural, and use of the masculine or feminine includes any or all other genders. If this Agreement shall be signed by more than one person as the Owner, all obligations hereunder on the part of the Owner to be observed and performed shall be joint and several.

*[Remainder Intentionally Left Blank; Signatures Appear on Following Pages]*

12

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the Effective Date.

OWNER:

By: _____
Its:

MANAGER:

By: _____
Its: *managing Member*

13

PARCEL 28:

THE SOUTHERLY HALF IN WIDTH OF THE NORTHERLY TWO-FIFTHS IN WIDTH OF THE FOLLOWING
DESCRIBED PROPERTY:

THE EAST HALF OF THE SOUTHWEST QUARTER AND GOVERNMENT LOTS 6 AND 7 OF SECTION 4, TOWNSHIP
19 NORTH, RANGE 12 WEST OF THE WILLAMETTE MERIDIAN;
EXCEPT THAT PORTION THEREOF LYING WITHIN A 60-FOOT STRIP CONVEYED TO GRAYS HARBOR COUNTY
FOR ROAD BY DEED DATED JANUARY 6, 1930, FILED DECEMBER 19, 1942, UNDER AUDITOR'S FILE NO.
425920, AND RECORDED IN VOLUME 236 OF DEEDS, PAGE 454, RECORDS OF GRAYS HARBOR COUNTY;
SITUATE IN THE COUNTY OF GRAYS HARBOR, STATE OF WASHINGTON.

PARCEL 30:

THE SOUTH HALF OF THE SOUTHERLY 1/3 IN WIDTH OF THE NORTHERLY 3/5 IN WIDTH OF THE FOLLOWING
DESCRIBED PROPERTY:

THE EAST HALF OF THE SOUTHWEST QUARTER AND GOVERNMENT LOTS 6 AND 7, ALL IN SECTION 4,

TOWNSHIP 19 NORTH, RANGE 12 WEST OF THE WILLAMETTE MERIDIAN;
EXCEPT THAT PORTION THEREOF LYING WITHIN A 60-FOOT STRIP CONVEYED TO GRAYS HARBOR COUNTY
FOR ROAD BY DEED DATED JANUARY 6, 1930, AND RECORDED IN VOLUME 236 OF DEEDS, PAGE 454,
RECORDS OF GRAYS HARBOR
COUNTY;
ALSO EXCEPT THAT PORTION LYING WITHIN THE PLAT OF IRON SPRINGS PARK EAST, AS PER PLAT
RECORDED IN VOLUME 10 OF PLATS, PAGES 77 THROUGH 79, RECORDS OF GRAYS HARBOR COUNTY;
SITUATE IN THE COUNTY OF GRAYS HARBOR, STATE OF WASHINGTON.

PARCEL 31:

THE SOUTHERLY TWO-FIFTHS IN WIDTH OF THE FOLLOWING DESCRIBED PROPERTY:
THE EAST ONE-HALF OF THE SOUTHWEST QUARTER AND GOVERNMENT LOTS 6 AND 7, ALL IN SECTION 4,
TOWNSHIP 19 NORTH, RANGE 12 WEST OF THE WILLAMETTE MERIDIAN;
EXCEPT THAT PORTION THEREOF LYING WITHIN A 60-FOOT STRIP CONVEYED TO GRAYS HARBOR COUNTY
FOR ROAD BY DEED DATED JANUARY 6, 1930, AND RECORDED IN VOLUME 236 OF DEEDS, PAGE 454,
RECORDS OF GRAYS HARBOR COUNTY;
ALSO EXCEPT THAT PORTION CONVEYED TO STATE OF WASHINGTON BY WARRANTY DEED DATED JULY 24,
1984, RECORDED AUGUST 16, 1984, AS AUDITOR'S FILE NO. 840817026, RECORDS OF GRAYS HARBOR
COUNTY, ALSO
EXCEPT THAT PORTION OF SAID SOUTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 4
DESCRIBED AS FOLLOWS:
BEGINNING AT A POINT ON THE SOUTH LINE OF SAID SUBDIVISION FROM WHICH POINT IN THE SOUTHEAST
CORNER THEREOF BEARS EAST A DISTANCE OF 805.62 FEET;
THENCE NORTH 49° 29' EAST 78.42 FEET;
THENCE NORTH 32° 07' EAST A DISTANCE OF 83.89 FEET;
THENCE NORTH 57° 53' WEST A DISTANCE OF 180.00 FEET, MORE OR LESS, TO A POINT 10.00 FEET DISTANT
FROM THE LINE OF ORDINARY HIGH WATER ON THE LEFT BANK OF BOON CREEK FLOWING SOUTHWESTERLY
THROUGH SAID SUBDIVISION, SAID 10.00 FEET BEING MEASURED NORMAL TO THE COURSE OF SAID CREEK;
THENCE SOUTHWESTERLY AND DOWNSTREAM PARALLEL WITH AND 10.00 FEET DISTANT FROM SAID LINE OR
ORDINARY HIGH WATER 260.00 FEET, MORE OR LESS, TO THE EASTERLY MARGIN OF THE NOW EXISTING 60-
FOOT WIDE RIGHT-OF-WAY OF SECONDARY STATE HIGHWAY NO. 9-C, SITUATE IN SAID SUBDIVISION;
THENCE SOUTHEASTERLY ALONG SAID EASTERLY MARGIN 41.0 FEET, MORE OR LESS, TO ITS INTERSECTION
WITH SOUTH LINE OF SAID SUBDIVISION;
THENCE EAST ALONG SAID SOUTH LINE 221.5 FEET, MORE OR LESS, TO THE PLACE OF BEGINNING;
ALSO EXCEPT THAT PORTION LYING WITHIN THE PLAT OF IRON SPRINGS PARK EAST, AS PER PLAT IN
VOLUME 10 OF PLATS, PAGES 77 THROUGH 79, RECORDS OF GRAYS HARBOR COUNTY;
SITUATE IN THE COUNTY OF GRAYS HARBOR, STATE OF WASHINGTON.

PARCEL 32:

LOT P OF THAT CERTAIN SHORT PLAT FILED JUNE 9, 1994 IN VOLUME 4 OF SHORT PLATS, PAGES 53 AND 54,
UNDER AUDITOR'S FILE NO. 940609096, RECORDS OF GRAYS HARBOR COUNTY;
(BEING A PORTION OF THE NORTHEAST QUARTER OF THE NORTHWEST QUARTER OF SECTION 9, TOWNSHIP
19 NORTH, RANGE 12 WEST OF THE WILLAMETTE MERIDIAN);
SITUATE IN THE COUNTY OF GRAYS HARBOR, STATE OF WASHINGTON.

PARCEL 33:

LOT 4 OF SSA 75-2 FILED MAY 29, 1975 IN VOLUME 1 OF SHORT PLATS, PAGES 7 THROUGH 16, UNDER
AUDITOR'S FILE NO. 66796, RECORDS OF GRAYS HARBOR COUNTY;
(BEING A PORTION OF GOVERNMENT LOT 1, SECTION 9, TOWNSHIP 19 NORTH, RANGE 12 WEST OF THE
WILLAMETTE MERIDIAN);
SITUATE IN THE COUNTY OF GRAYS HARBOR, STATE OF WASHINGTON.

EXHIBIT B

Manager Compensation

Resort Management Fees

For performance pursuant to the terms and conditions of the Agreement, Owner shall compensate Manager as follows:

A.  <u>Resort Management Fee</u>.  Owner agrees to pay to Manager a monthly resort management fee for all work actually performed by Manager on behalf of Owner. The monthly resort management fee for each type of work performed under this Agreement shall be equal to the percentage of the Gross Lodging Income of the Resort in accordance with the following:

| | | |
|---|---|---|
| i. | On Site Administration: | five percent (5%) |
| ii. | Marketing & Advertising: | two percent (2%) |
| iii. | Reservations/Booking: | ten percent (10%) |
| iv. | Website/Software Administration: | two percent (2%) |
| v. | Monthly/Yearly Accounting and Reporting: | one percent (1%) |

B.  <u>Group Sales</u>.  Owner shall pay to Manager an additional six percent (6%) of the revenue actually received by Owner for group reservations and bookings the Sunspots Resorts Network Group Sales Department procures for the Resort. To receive credit for Group Sales, Manager shall designate any such group reservations and booking as procured by the Sunspots Resorts Network Group Sales Department at the time such reservations and bookings are made. Any deposits or prepayments received by Manager or Owner shall not be included as "revenue actually received" for group reservations and bookings under this subsection (B).

C.  <u>Start up Costs:</u>  Owner shall upon mutual execution of this Agreement, pay a one-time start up cost reimbursement of Eighteen Thousand Three Hundred Dollars ($18,300) to Manager for those services outlined on Schedule 1 attached to this Exhibit B.

As used in this Agreement, the term "Gross Lodging Income" shall mean and refer to the total income in cash or credit actually received by Manager or Owner for the rental, cleaning, maintenance, food service, or other fees paid by Resort guests for use of the Resort. Notwithstanding the foregoing, or anything in the Agreement to the contrary, Gross Lodging Income does not include any income received by Manager or Owner from Owner's family members or their guests. Gross Lodging Income shall be net of any discounts, promos, give-a-ways to any hotel critics, public relations or other promotional purposes. Further, Gross Lodging Income shall be paid on an accrual basis. Any deposits or prepayments received by Manager or Owner shall not be included within Gross Lodging Income.

October 3, 2010 - William Low
Page 11 of 11 pages

 

## Start-Up Services

For general consulting time during start up service, the rate is $145/hour or $95/hour if we are engaged as full-service managers.

**Start-Up Services**

| Management Services | Hours | A-la-carte | | On Contract | |
|---|---|---|---|---|---|
| Planning, Concepts, Development & Participation | 30 | $ | 3,750 | $ | 2,250 |
| Business Plan | 16 | $ | 2,000 | $ | 1,200 |
| Financial Plan | 12 | $ | 1,500 | $ | 900 |
| Rate Study & Projections | 10 | $ | 1,250 | $ | 750 |
| Marketing Plan | 16 | $ | 2,000 | $ | 1,200 |
| Operating Manuals | 24 | $ | 3,000 | $ | 1,800 |
| Property setup | 40 | $ | 5,000 | $ | 3,000 |
| Opening Plans | 16 | $ | 2,000 | $ | 1,200 |
| HDR Photography & Panos (30 groups x12) | NA | $ | 7,200 | $ | 5,900 |
| HDR Panos (30 sites x 1) | NA | $ | 4,800 | $ | 3,600 |
| Floor plan renderings | NA | $ | 2,600 | $ | 2,100 |
| Resort Website Custom Graphics (Optional) | NA | $ | 2,600 | $ | 2,100 |
| Universal Content (Providers, Events, News) | NA | $ | 950 | $ | 750 |
| Logotypes & Graphics | NA | $ | 1,750 | $ | 1,450 |
| Total | NA | $ | 40,400 | $ | 28,200 |
| Package | | $ | 30,300 | $ | 18,330 |

## Continuing Services

Services are priced on a percentage or flat rate basis.

**Continuing services**

| Service | A-la-Carte | Contract |
|---|---|---|
| Onsite Administration | - | 5.0% |
| Marketing, Advertising & Media Buying | 2.5% | 2.0% |
| Central Reservations & Administration | 15.0% | 10.0% |
| Websites & Software | 2.5% | 2.0% |
| Accounting & Reporting | 1.5% | 1.0% |
| | 21.5% | 20% |

| | | |
|---|---|---|
| Groups Sales (Not on Total Revenue) | 7.0% | 6.0% |

Lodging Managers for unique Inns, Resorts & Vacation Rental Homes. In the Sunspots Network, each Office is independently owned.